UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| R.G., a minor, through SHREATHA BUCKHANAN, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:19-CV-05709 |
| v. | ) ) ) | Judge Edmond E. Chang |
| KILOLO KIJAKAZI, ACTING COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Shreatha Buckhanan brings this action on behalf of her minor son, R.G., to review the government's denial of R.G.'s application for Supplemental Security Income and Disability Insurance Benefits.[1] Buckhanan claims that her son suffers from speech delays, learning delays, and behavior problems, making him eligible for disability benefits under the Social Security Act, 42 U.S.C. 1382(a)(3)(c). R. 1, Compl. at 1–3.[2] The issue in this case is whether the Administrative Law Judge made any error that provides a basis for reversal or remand. Buckhanan attached new evidence to her request for reversal and suggested that there were mistakes at the administrative hearing. R. 13, Pl.'s Br. In response, the government filed a summary judgment motion asking to affirm the Commissioner's decision. R. 21, Def.'s Mot. Summ. J. For the

---

[1]This Court has subject matter jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). The Acting Commissioner of Social Security, Kilolo Kijakazi, is substituted as the named Defendant under Federal Rule of Civil Procedure 25(d).

[2]Citations to the docket are indicated by "R." followed by the docket entry and, when necessary, a page or paragraph number.

reasons set forth below, Buckhanan's motion is denied and the Commissioner's motion for summary judgment is granted.

## I. Background

Buckhanan first applied for disability benefits on behalf of her son back in May 2016. *See* R. 7-1, Certified Administrative Record (CAR) at 87. R.G.'s application was initially denied a few months later, and then denied again on reconsideration at the end of 2016. *Id*. at 14. Buckhanan then requested a hearing in front of an Administrative Law Judge, which was held in April 2018. *Id*. After the hearing, the Administrative Law Judge issued a decision holding that although Buckhanan's son has severe impairment in the form of an expressive language delay, developmental delay, and a learning disability, he does not qualify as disabled because the impairments do not meet the required level of severity. *Id*. 14, 17–29. Because Buckhanan's son did not meet the disability requirements under 42 U.S.C.S. § 1382c , the request for benefits was denied. *Id*. at 14. The Appeals Council declined Buckhanan's request for review, rendering the Administrative Law Judge's ruling the final decision of the Commissioner. *Id*. at 4; *see Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### A. Factual Background

The Certified Administrative Record supplies the factual background of this case. CAR. Buckhanan's son R.G. was born in June 2013. *Id*. at 17. When R.G. was a toddler, Buckhanan became concerned that he was only saying two or three words. *Id*. at 19. At that age, R.G. could follow simple commands, respond to his name, and could engage in physical activities like walking up steps, running, and throwing

2

objects overhand. *Id.* He could put on his clothes and brush his teeth, yet he had mild speech and developmental delays. *Id.* at 331, 339, 388. The speech concerns persisted—R.G. continued using around only 15 words to express himself, and Buckhanan believe that R.G's vocabulary was limited for his age. *Id.* at 295, 317. Once it became clear that R.G. had some developmental or language delays, Buckhanan began advocating for her son, and R.G. was consistently evaluated for school services and disability eligibility over the next few years. Those records are discussed next.

### B. Function Reports and Parental Questionnaire

One way that Buckhanan has documented R.G.'s development is through various self-report questionnaires that she filled out for R.G.'s medical appointments. At R.G.'s 24-month check-up, Buckhanan answered "yes" to most questions about his developmental progress being on track, but she did note that R.G.'s speech was not like that of other children his age and that she had a hard time understanding what he was saying. CAR at 356–64. As part of the disability-determination process, Buckhanan also filled out function reports in May 2016 and October 2016. *Id.* at 130–46, 206–22. The May 2016 report says that R.G. continued to show some problems talking and that he was having difficulty understanding and learning certain things. *Id.* at 135. Buckhanan also reported, however, that R.G.'s impairment did not affect his behavior with other people or his ability to help take care of his personal needs. *Id* at 137. But Buckhanan's opinion on that question changed by October of that same year. *Id.* at 206–22. In the October function report, Buckhanan checked the box reporting that R.G. was totally unable to speak and that his ability to communicate was limited;

3

at the same time, however, she also checked the box stating that his impairment did not limit his progress in understanding and using what he learns. *Id*. at 208, 210. She noted on that report that R.G.'s impairments did in fact affect his habits and ability to care for his own needs. *Id*. at 212.

### C. Early Intervention Services

Separate from efforts to obtain disability benefits, R.G. was also evaluated for early-intervention services. CAR at 276–89. The initial evaluation, which took place in 2015, recommended speech-language therapy. *Id*. at 281, 337, 346. R.G.'s early-intervention records also include a September 2015 assessment of R.G.'s speech and language from the Child and Family Development Center at the University of Illinois. *See id*. at 292–97. The report from the Child and Family Development Center notes moderate delays in cognitive and speech-language development for R.G. at that time. *Id*. at 297. The Illinois Department of Human Services Bureau of Early Intervention conducted follow-up assessments in February 2016, *id*. at 290–97, and June 2016, *id*. at 315–16. The February 2016 intervention assessment lists R.G.'s cognitive development as low for a child his age, and the June 2016 assessment lists his cognitive development as "slightly" low. *Id*. at 314, 315.

### D. Individualized Education Plan

When R.G. transitioned from pre-school early intervention services to a formal school setting, he was evaluated for an individualized education plan (commonly referred to as an IEP). CAR at 149–50, 347. A preliminary-eligibility assessment meeting found that R.G.'s developmental milestones were on track except for speech. *Id*.

at 149–50. He could perform self-care activities appropriately for his age. *Id*. R.G. received speech and developmental therapy beginning in February 2016. *Id*. The IEP team reported that R.G. had a developmental delay that was adversely affecting his educational performance. *Id*. at 152. To remedy that adverse effect, the IEP noted that R.G. required special education and services. *Id*. The eligibility determination for an IEP was based on his developmental delay. *Id*. at 153. R.G. received specialized instruction for speech and general-language development. *Id*. at 167. In April 2017, another IEP meeting was held, and it was again determined that R.G. should receive special education and related services. *Id*. at 223.

### E. Social Security Disability Evaluations

In 2016, two separate disability examiners (with the assistance of physicians) evaluated R.G. and his medical records for disability determinations. CAR 65–74, 75–87. Both reports note that R.G. has two severe impairments: a speech and language impairment, as well as a learning disorder. *Id*. at 68, 80. The corresponding listing for both reports is 112.02: Organic Mental Disorders. *Id*. As part of the disability-evaluation process, multiple members of the Chicago Consulting Physicians also reviewed the reports case and spent time with R.G. *Id*. at 367. The evaluations were both consistent with previous observations of R.G.—no one disputes that R.G has speech and general language delays. *Id*. at 370, 377.

### F. Administrative Hearing

Buckhanan and R.G. appeared before the Administrative Law Judge (ALJ) in April 2018; they were represented by counsel at the hearing. CAR at 34, Transcript.

The ALJ asked questions of both R.G. and Buckhanan. *Id.* At the start of the hearing, R.G. told the ALJ his name and his age. CAR at 36. The ALJ started with questions about school and friends. *Id.* at 40. R.G. responded that he likes toys, and that he plays with two friends at school. *Id.* Throughout the hearing, R.G. said both that he plays with friends, but also that sometimes no one will play with him and he plays by himself. *Id.* at 40–41, 46. R.G. identified various colors of items around the room when asked. *Id.* at 41–42. R.G. recited the alphabet, identified the clock on the wall, and read the numbers on the clock, stopping at 11. *Id.* at 42–43. The ALJ asked R.G. to identify the number at the top of the clock, and R.G. said one (instead of 12). *Id.* But on further questioning, R.G. told the ALJ that he had heard of the number 12. *Id.* The questioning moved on to shapes. When asked about the shape on the bottom of R.G.'s cup, he gave the color rather than the shape. *Id.* at 43. The ALJ repeated the question and R.G. said the shape was a diamond, but the bottom of the cup was actually a circle. *Id.* When asked about the shape of a sign on the wall, R.G. again responded with a color instead of the shape. *Id.*

The exchanges at the hearing continued. R.G. was able to spell his first name, and also told the ALJ that he liked to play with toys; occasionally has friends over to his house; could dress himself; and he brushes his own teeth. *Id.* 44–47. Toward the end of the hearing, R.G. communicated that Buckhanan had tied his shoes that day, but that he can use the bathroom by himself. *Id.* at 50. When the ALJ showed R.G. a few individual letters of the alphabet, R.G. incorrectly identified the letters a few times. *Id.* 47–48. R.G. was asked to count to 20; he did so, but missed the numbers 12

6

and 13 and stopped once he got to 18. *Id*. at 48. At the end of R.G.'s questioning, he confirmed that he could use the bathroom and could button his pants on his own. *Id*. at 50.

Buckhanan's testimony came next. Buckhanan told the ALJ that she noticed R.G. had speech and learning delays. *Id*. at 51. She said that, at home, R.G. has trouble remembering letters and numbers and that he does not like to do his own buttons. *Id*. at 51–52. Also, R.G. does not want to engage with Buckhanan when she tries to review words and letters with him, and that he occasionally does the same with his speech therapist. *Id.* at 55–59.

When discussing R.G.'s social behavior, Buckhanan testified that, at school, R.G. stays to himself and does not interact with other children. CAR at 52. In response to the ALJ's questioning, Buckhanan also noted that R.G. likes to play with drums, he can watch television shows like Batman for 15 to 30 minutes at a time, and he plays nicely with the family dog. *Id*. at 54–55. Buckhanan also told the ALJ that she dressed R.G. on that day, but R.G. chimed in to add that he did it himself. *Id*. The ALJ concluded the hearing by asking R.G. to identify the color of various markers and to draw certain shapes. *Id*. at 59–62. R.G. correctly identified nine out of 12 colors. *Id*. at 61. He drew a circle on the second try, a square, a diamond, and got close to drawing a triangle. *Id*. at 61–62.

### G. The Disability-Determination Process

A child under the age of 18 is disabled if the child has a "medically determinable physical or mental impairment, which results in marked and severe functional

7

limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."42 U.S.C. § 1382c (a)(3)(C)(i). The regulations set forth a three-part analysis for determining whether a child is disabled. 20 C.F.R. § 416.924(a); *see also Flener v. Barnhart*, 361 F.3d 442, 443 (7th Cir. 2004). The test requires the Commissioner to consider: (1) whether the claimant is working (or, in SSA parlance, engaged in "substantial gainful activity"), 20 C.F.R. § 416.924(b); (2) if the claimant is not working, whether the claimant has a medically determinable impairment that is severe or a combination of impairments that is severe, 20 C.F.R. § 416.924(c); and (3) if the claimant has a severe impairment, whether the claimant has an impairment or combination of impairments that meets or medically equals the severity of a "listing" in 20 C.F.R. Part 404, Subpart P, Appendix 1, or that functionally equals the listings. 20 C.F.R. § 416.924(d); *see also Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009).

Here, the third step determined the outcome of the case. The specific listings analyzed by the ALJ at Step 3 were 112.02 and 112.14. Listing 112.02 governs neurocognitive disorders, and listing 112.14 covers developmental disorders in infants and toddlers. *See* 20 C.F.R. § Pt. 404, Subpt. P, Appx. 1. Whether a set of impairments *meets* or *medically* equals a listing is a separate question from whether the impairments *functionally* equal the listings (emphasis added). *Id*. On the first part of Step 3, both 112.02 (neurocognitive disorders) and 112.14 (developmental disorders) set forth the specific criteria that the impairment or set of impairments must meet or

8

medically equal for the person to be disabled. To medically meet 112.02 (neurocognitive disorders), the requirements are as follows:

> 112.02. Neurocognitive disorders, satisfied by A and B, or A and C:
>
> A. Medical documentation of a clinically significant deviation in normal cognitive development or by significant cognitive decline from a prior level of functioning in *one* or more of the cognitive areas:
>
> 1. Complex attention;
> 2. Executive function;
> 3. Learning and memory;
> 4. Language;
> 5. Perceptual-motor; or
> 6. Social cognition.
>
> AND
>
> B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 112.00F):
> 1. Understand, remember, or apply information (see 112.00E1).
> 2. Interact with others (see 112.00E2).
> 3. Concentrate, persist, or maintain pace (see 112.00E3).
> 4. Adapt or manage oneself (see 112.00E4).
>
> OR
>
> C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
>
> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 112.00G2b); *and*
>
> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 112.00G2c).

20 C.F.R. Pt. 404, Subpt. P, Appx 1, 112.02.

To medically equal listing 112.14 (developmental disorders), there are two subcategories that must be satisfied. There must be medical documentation of one or both of the following: a delay or deficit in the development of age-appropriate skills; or a loss of previously acquired skills. 20 C.F.R. § Pt. 404, Subpt. P, Appx. 1, 112.14. Subpart B requires extreme limitation of one, or marked limitation of two, of the following developmental abilities: plan and control motor movement (*see* 112.00I4b(i)), learn and remember (*see* 112.00I4b(ii)), interact with others (*see* 112.00I4b(iii)), regulate physiological functions, attention, emotion, and behavior (see 112.00I4b(iv)).

Under Step 3, if the combination of impairments does not meet or medically equal Category A or B, a child may still be considered disabled if the child's condition "functionally equals" a listing. 20 C.F.R. § 416.924(d). The regulations list the following six areas of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(d). Functional equivalence can be found in one of two ways: a child's impairment results in (1) "marked" limitations in two domains or (2) an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(b)(1). A "marked" limitation means the impairment interferes with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). It is "more than moderate" but "less than extreme." *Id*. And an "extreme" limitation means the impairment very seriously interferes with the child's "ability to independently initiate, sustain, or complete activities" in a domain. 20 C.F.R. § 416.926a(e)(3).

## H. The ALJ's Decision

In the decision under review, the Administrative Law Judge walked through the three-step framework to determine whether a child is disabled under the statute. CAR at 15–29. First—and not surprisingly—the ALJ found that R.G. had not been employed, that is, had not engaged in substantial gainful activity. CAR at 17. At Step Two, the Judge concluded that R.G. does have two severe impairments: expressive language delay and developmental delay/learning disability. *Id.*

Because the ALJ found that R.G. has severe impairments, the ALJ moved on to whether the combination of those impairments meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, Appx. 1. *Id.* The ALJ considered all of the listings, but specifically analyzed listings 112.02 and 112.14. CAR at 17–29. The ALJ concluded that none of the findings on R.G.'s impairments show that they could satisfy the medical severity requirements for any listed impairment. CAR at 17. This conclusion was supported by the findings of various treating and examining physicians and by the opinions of the state agency medical consultants. *Id.* at 17.

After determining that R.G.'s impairments do not meet or medically equal the severity of one of the listed impairments, the ALJ focused on whether R.G.'s combination of impairments *functionally* equals the severity of the listings. CAR at 18–29. The relevant evidence reviewed by the ALJ included medical records, evaluations from teachers, statements from Buckhanan, statements from R.G. himself, and any other evidence in the case record including R.G.'s functioning across time and across

11

different settings. *Id.* at 18. Ultimately, the ALJ found that although R.G. had some functional limitations because of his impairments, only one domain showed a marked level of impairment—interacting and relating to others. *Id.* at 26. And as discussed earlier, there must be marked levels of impairment across *two* domains to satisfy the definition of disabled.

## II. Standard of Review

The Social Security Act provides for limited judicial review of a final decision of the Commissioner. *See* 42 U.S.C. § 405(g). The Appeals Council's decision to not review an Administrative Law Judge's ruling constitutes a final decision of the Commissioner. *Villano*, 556 F.3d at 561–62. A decision must be reversed if the Commissioner committed an error of law or if the record as a whole does not contain substantial evidence to support the Commissioner's findings. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). If there is an error of law, then reversal is warranted, no matter how much evidence supports the final determination. *Schmoll v. Harris,* 636 F.2d 1146, 1150 (7th Cir. 1980). A decision contains an error of law when it fails to comply with the Commissioner's regulations. *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (reversing decision that did not comply with regulation concerning weight given to treating physician).

Although legal conclusions are reviewed *de novo*, the ALJ's factual findings are granted deference and must be affirmed if they are supported by substantial evidence in the record. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Evidence is substantial if a reasonable person would accept it as adequate to support the ALJ's decision. *Id.* at 1160. The Court may not "decide the facts anew, reweigh the evidence or

12

substitute its own judgment for that of the [ALJ]." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 2001). However, "[a]lthough this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not select and discuss only the evidence that favors the ultimate conclusion. *See Murphy v. Astrue*, 496 F.3d 630, 634-35 (7th Cir. 2007); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Although the ALJ is not required to discuss every piece of evidence in the record, the ALJ must set forth an accurate and logical bridge between the evidence and the conclusion, so that a reviewing court may assess the validity of the ultimate findings and afford the claimant meaningful judicial review. *Jones,* 623 F.3d at 1160. "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

### III. Analysis

Buckhanan is representing herself.[3] *See* Pl.'s Br. Both this Court—and the Commissioner—thus must construe her filings expansively. *See Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001). Buckhanan does not point to any specific legal error, but her overarching argument is that the ALJ incorrectly denied R.G.'s disability benefits. Pl.'s Br. at 2. To support this argument, Buckhanan suggests that the ALJ made errors when asking R.G. questions during the hearing and that R.G.'s school evaluations and IEP show that he is disabled. *Id*. Buckhanan also attaches

---

[3]R.G., through Buckhanan, was represented by counsel at the hearing before the Administrative Law Judge. *See, e.g.*, CAR at 267–71.

new documents to her brief, implying that the new documents support reversal or remand. *See* Pl.'s Br. at 3–47. In support of the government's summary judgment motion, the Commissioner notes that counsel represented R.G. at the hearing and that the lawyer made no suggestion that the ALJ committed an error during the hearing. R. 22, Def.'s Br. at 8. Buckhanan argues that the ALJ's questioning confused R.G., and that the ALJ changed or contradicted R.G.'s answers. Pl.'s Br. at 2.

The record does not support Buckhanan's characterization of the evidentiary hearing. The hearing lasted around 40 minutes, CAR at 34–64, and the transcript reflects that the ALJ asked R.G. a wide range of appropriate questions—including questions about his name and age, colors, numbers, toys, hobbies, and interactions with other children, *id*. If R.G. hesitated on an answer or answered incorrectly, then the ALJ followed up to clarify. *See, e.g., id*. at 40–41, 44, 46. The ALJ also accurately represented the testimony of the hearing in the written decision. CAR at 17–29. Indeed, the ALJ did *not* exclusively set forth testimony against R.G.'s position; the written decision included the testimony that weighed in R.G.'s favor, including that R.G. does have some learning disabilities and R.G. did have some difficulty while testifying and made mistakes during the hearing that reflected developmental delays. *Id*. at 18, 21, 24. For example, the ALJ's decision pointed out that R.G. missed a few color identifications and did not say the number 12. *Id*. at 18. So there is no basis to accept Buckhanan's characterization of the ALJ's verbal questioning and written decision as unfair.

14

Buckhanan also highlights the findings of one of R.G.'s doctors—Dr. Nicole Celio. Pl.'s Br. at 2. Buckhanan correctly points out that Dr. Celio's opinion was that R.G. had a speech impairment and learning-impaired development. *Id.* But the ALJ's decision explicitly says that he reviewed the findings of the treating and examining physicians. CAR at 17. Indeed, the ALJ too concluded that R.G. suffers from "severe"-level impairments, specifically, expressive language delay and developmental delay/learning disability. *Id.* So Dr. Celio's opinion was taken into account by the ALJ. The problem for the benefits application was that those impairments did not equal the severity of the *listed* impairments, nor did they functionally meet the listed impairments. As explained earlier, the key listings in this case were 112.02 and 112.14. CAR at 17–29. The ALJ's findings that R.G.'s impairments fell short of the listed impairments was supported by the findings of various treating and examining physicians and by the opinions of the state agency medical consultants. *Id.* at 17. Nor did the combination of R.G.'s impairments *functionally* equal the severity of the listings. CAR at 18–29. Here too, the ALJ relied on relevant medical records, evaluations from teachers, statements from Buckhanan, and statements from R.G. himself. *Id.* at 18. The ALJ explained in detail the relative weight he gave to the records he reviewed: first, the ALJ gave great weight to the speech-language evaluation at the Child and Family Development Center (2015), the full evaluation by the Illinois Department of Human Services (2016), the speech consultative evaluation (2016), and the Disability Determination Evaluation (2016). CAR 20–22. The ALJ gave less weight to the February 2016 report by the Illinois Department of Human Services Bureau of

15

Intervention because that report found R.G.'s speech to be normal, which was inconsistent with the other records. *Id.* at 20. The function report filled out by Buckhanan in May 2016 also received only partial weight because other documentation did not support that R.G. had delays in engaging in play or staying on task. *Id.*

In evaluating R.G.'s limitations in the six functional areas, the ALJ described in detail the standard for each domain. CAR 22–29. He then explained why R.G. either did or did not have a marked limitation in those areas. *Id.* The ALJ concluded that R.G. has a less-than-marked limitation in acquiring and using information because, for example, he could follow two-part commands, follow directions, and answer the ALJ's questions about colors and numbers with only minor errors. *Id.* at 22–23. R.G.'s less-than-marked impairment in attending and completing tasks was supported by the fact that his teacher said that there were no more than slight problems in this area and because R.G. can put on his own clothing, brush his teeth, and look for help when needed. *Id.* at 24–25. For interacting and relating to others, which assesses, among other things, how well a child can initiate and sustain emotional connections with others, the ALJ noted that R.G. does have a marked limitation in this area. *Id.* at 25–26. The ALJ found this to be the area most impacted by R.G.'s well-documented speech and expressive delays. There are no marked limitations in R.G.'s ability to move and manipulate objects, his ability to care for himself in an age-appropriate way, or his physical health and well-being—the final three domains. For those findings, the ALJ pointed to R.G.'s medical evaluations on his health, gross and fine motor skills, his skills in getting dressed, brushing his teeth, and demonstrations

16

of sound judgment for a child his age. *Id*. at 26–29. From all of the analysis throughout the written decision, the ALJ demonstrated a logical bridge that R.G.'s impairments do not cause marked limitations in two domains or an extreme limitation in one domain—so he is not considered disabled under the statute. Overall, the "ALJ need not address every piece of evidence in his decision … [and] need only build a bridge from the evidence to his conclusion." *Sims v. Barnhart*, 309 F.3d 424, 426 (7th Cir. 2002) (cleaned up).[4] The ALJ did that in this case.

Buckhanan also implies that the ALJ's decision should be reversed because R.G. qualifies for an individualized education plan (known as an IEP) and thus must have severe impairments. Pl.'s Br. at 2. Here again the ALJ discussed R.G.'s IEPs and the teacher questionnaires. CAR at 21–22. The information provided in the IEPs and teacher questionnaires are specifically part of the written decision's analysis into the functional equivalence areas: less-than-marked limitation in acquiring and using information (IEPs discussed at CAR at 23–24) and less-than-marked limitation in interacting and relating with others (IEPs discussed at CAR at 26). This analysis shows that the ALJ's decision was supported by substantial evidence and did appropriately consider the IEPs.

Finally, Buckhanan attaches documents to her brief, but those records were not in front of the ALJ. The documents include R.G.'s 2019 IEP, Pl.'s Br. at 5–26, 46–47, R.G.'s 2020 IEP, Pl.'s Br. at 27–44, and an appointment reminder documenting a

---

[4]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

behavioral health visit, CAR at 4. But the government is right that this Court may only consider evidence that was before the ALJ. *See, e.g.*, *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). Indeed, the three documents that Buckhanan includes with her brief are dated *after* the administrative hearing and so they were not considered by the ALJ—and the records thus will not be considered here.

## IV. Conclusion

For the reasons discussed in this Opinion, the government's decision denying benefits is supported by substantial evidence and free of legal errors. The Commissioner's motion for summary judgement is granted, and the decision is affirmed. Buckhanan's motion is denied. The status hearing of August 26, 2022, is vacated. A separate AO-450 final judgment will be entered.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 25, 2022